IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

IN THE MATTER OF THE SEARCH OF )   No. 3:19-MJ-00556MMS
)
Email Accounts of )
ksizzle1988@gmail.com )
badbitty1988@gmail.com )
_____ )

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Dale Boothroyd, am a Task Force Officer with the Drug Enforcement

Administration (DEA), in the Anchorage, Alaska, District Office, and in that

capacity declare and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this Affidavit in support of an application for a search warrant related to

   offense under 21 U.S.C. §§ 846 and 841(a)(1) (Conspiracy to Distribute Narcotics)

   and 18 U.S.C. §§ 924(c) (Possession of a Firearm in Furtherance of a Drug

   Trafficking Offense) and 1201 (Kidnapping) for information associated with an

   account that is stored at premises owned, maintained, controlled, or operated by

   Google LLC ("Google"), hereinafter referred to as the "Communication Accounts

   Provider," more fully described in Attachment A, including the contents of

   communications.

   (a) Information associated with Google Gmail e-mail accounts

   ksizzle1988@gmail.com (hereinafter, "SUBJECT GMAIL ACCOUNT 1")



NOV 1 8 2019

1

and badbitty1988@gmail.com hereinafter, "SUBJECT GMAIL ACCOUNT 2"), which is stored at premises owned, maintained, controlled, or operated by Google LLC, located at 1600 Amphitheater Parkway, Mountain View, California 94043

2. The requested search warrant seeks authorization to seize any data on the SUBJECT GMAIL ACCOUNTS that constitutes evidence or fruits of violations. I believe evidence, fruits, and instrumentalities of violations 21 U.S.C. §§ 846 and 841(a)(1) (Conspiracy to Distribute Narcotics) and 18 U.S.C. §§ 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Offense) and 1201 (Kidnapping) are located within the SUBJECT GMAIL ACCOUNTS.

3. I have been employed as a Task Force Officer with the Drug Enforcement Administration since October 2018. Prior to my assignment with the Drug Enforcement Administration, I was assigned to the Statewide Drug Enforcement Unit with the Alaska State Troopers from April 2018 to September 2018. Prior to my assignment with AST, I was assigned to uniformed patrol with the Anchorage International Airport Police/Fire Department for six years. Thus, in total I have approximately 7 years of law enforcement experience.

4. During the course of my law enforcement career, I have written and/or executed numerous search and seizure warrants for narcotics, dangerous drugs, and related records, and assisted in the seizure of hundreds of thousands of dollars in proceeds and/or assets derived from such illegal activity.

NOV 1 8 2019

2

5. During the course of my employment as a law enforcement officer, I have gained experience in conducting drug investigations and have received the benefit of many years of such experience of fellow agents, investigators and officers.

6. During the course of my employment with the these three agencies, I have worked in an undercover capacity and conducted investigations of controlled substances violations in conjunction with agents, investigators and officers from other jurisdictions. I have also worked with and conducted investigations utilizing confidential sources. I have also conducted or assisted in investigations which have led to the arrest and conviction of persons for violations dealing with the sale, possession and/or manufacture of controlled substances, and the seizure and forfeiture of assets. As part of these investigations, I have able to interview arrested subjects and their associates. Through these interviews, I have learned how and why these offenders conduct various aspects of their drug trafficking activities, to include communicating, manufacturing, packaging, distribution, transportation and concealment of controlled substances and assets and money laundering.

7. I attended the Alaska Law Enforcement Training Academy #12-02 where I received 947 hours of training. I have obtained my Intermediate Police Certificate from the Alaska Police Standards Council. I have attended a 40 hour "Jetway" training course presented by the Drug Enforcement Administration and El Paso Intelligence Center. I have attended a 40 hour "Undercover Survival and Tactics" course present by the Midwest Counterdrug Training Center. I have also attended a 7 hour course on Drugs in Alaska at the State Crime Laboratory. I have obtained an A.A.S degree from Finger



NOV 1 8 2019

3

Lakes Community College, graduating in 2009 with a major in Conservation Law Enforcement.

8. Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included in this affidavit every detail of every aspect of the investigation. Rather, I have set forth facts that I believe are sufficient to establish probable cause for the issuance of the requested search warrant. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

9. I make this affidavit based, in part, on personal knowledge derived from my participation in this investigation and, in part, upon information and belief. The sources of my information and belief are: (a) oral and written reports about this and other investigations, which I have received directly or indirectly from officers/agents of the Drug Enforcement Administration and other state and federal law enforcement agencies; as well as sources of information as identified herein (b) and physical surveillance conducted by law enforcement entities which was reported to me directly or indirectly. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant, and does not set forth all of my knowledge about this matter.

10. This affidavit sets forth the facts that I believe are necessary to establish probable cause that evidence of a crime, contraband, fruits of crime, or other items illegally possessed, or property designed for use, intended for use, or used in committing a crime in violation of 21 U.S.C. §§ 846 and 841(a)(1) (Conspiracy to Distribute



NOV 1 8 2019

4

Narcotics) and 18 U.S.C. §§ 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Offense) and 1201 (Kidnapping) are located in the SUBJECT GMAIL ACCOUNTS.

## BACKGROUND AND PURPOSE OF AFFIDAVIT

11. This investigation relates to the suspected methamphetamine trafficking activities of Pati LATWER Jr. and the associated commission of violations of 21 U.S.C. §§ 846 and 841(a)(1) (Conspiracy to Distribute Narcotics) and 18 U.S.C. §§ 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Offense) and 1201 (Kidnapping)

## JURISDICTION

12. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States … that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## DEFINITIONS

13. The following technical terms are relevant to my affidavit in support of this application for a search warrant.

   (a) As part of my training, I have become familiar with the Internet (also commonly known as the World Wide Web), which is a global network of



NOV 1 8 2019

5

computers[1] and other electronic devices that communicate with each other using various means, including standard telephone lines, high-speed telecommunications links (e.g., copper and fiber optic cable), and wireless transmissions, including cellular networks and satellite. Due to the structure of the Internet, connections between computers on the Internet routinely cross state and international borders, even when the computers communicating with each other are in the same state. Individuals and entities use the Internet to gain access to a wide variety of information; to send information to, and receive information from, other individuals; to conduct commercial transactions; and to communicate via electronic mail ("e-mail"). An individual who wants to use Internet e-mail must first obtain an account with a computer that is linked to the Internet, for example, through a university, an employer, or a commercial service, which is called an "Internet Service Provider" or "ISP." Once the individual has accessed the Internet, that individual can use an e-mail account provided by their ISP or they can use the Internet to connect to web-based e-mail services (such as those provided by Google Gmail, Yahoo! Mail, and Microsoft Hotmail) to send and receive e-mail. Web-based e-mail services provide e-mail accounts that may be accessed from any computer that has

---

[1] The term "computer" is defined by 18 U.S.C. § 1030 (e) (1) to mean "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device." This definition includes modern day cell phones, or "smart phones."



NOV 1 8 2019

6

access to the Internet. In addition, the individual can access websites using web browsers (computer programs that permit users to navigate through pages of information that are stored on remote computers, such as Internet Explorer and Google Chrome) to view or download content or to make purchases. The Internet may also be used to access e-groups (websites that require users to subscribe, and permit subscribers to post messages, chat electronically, post and transfer files and share information), newsgroups (that permit posting of e-mail messages regarding specific topics), and video conferencing.

(b) Set forth below are an alphabetical listing of some definitions of technical terms, used throughout this Affidavit, and in Attachments A and B, attached hereto, pertaining to the Internet and computers more generally.

    i. *Computer Server (or Server)*: A computer that is attached to a dedicated network and serves many users. A web server, for example, is a computer which hosts the data associated with a website. That web server receives requests from a user and delivers information from the server to the user's computer via the Internet.

    ii. *Computer software*: Digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.



NOV 18 2019

7

iii. *Domain Name*: "Domain names" are common, easy to remember names associated with an internet protocol address (defined below). For example, a domain name of "www.usdoj.gov" refers to the internet protocol address of 149.101.1.32.

iv. *Domain name system (DNS) server*: A computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser. Essentially, the domain name must be translated into an Internet Protocol (IP) address so the computer hosting the web site may be located, and the DNS server provides this function. A Dynamic DNS (DDNS) is a method of automatically updating a name server in the Domain Name System (DNS), often in real time, with the active DNS configuration of its configured hostnames, addresses or other information.

v. *Internet Service Providers (ISPs) and the Storage of ISP Records*: Internet Service Providers are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including fiber optic, digital subscriber line (DSL), cable, cellular networks, dedicated circuits, or satellite-based subscription. ISPs typically charge a fee based



NOV 1 8 2019

8

upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP and can access the Internet. ISPs maintain business and other records ("ISP records") pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format. ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers' use. This service by ISPs allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files. Typically, e-mail that has not been opened by an ISP customer is stored temporarily by an ISP incident to the transmission of that e-mail to the intended recipient, usually within an area known as the home directory. Such temporary, incidental storage is defined by statute as "electronic



Case 3:19-mj-00556-MMS   Document 1-1   Filed 11/18/19   Page 9 of 22

storage." _See_ 18 U.S.C. § 2510 (15). A service provider that is available to the public and provides storage facilities after an electronic communication has been transmitted and opened by the recipient, or provides other long-term storage services to the public for electronic data and files, is defined by statute as providing a "remote computing service." See 18 U.S.C. § 2711(2).

vi. _Internet Protocol Address (IP Address)_: Every computer or device on the Internet is referenced by a unique internet protocol address the same way every telephone has a unique telephone number. An IP address is a series of four numbers separated by a period, and each number is a whole number between 0 and 255. An example of an IP address is 216.81.94.70. Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address. A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Some ISP's employ dynamic IP addressing, that is they allocate any unused IP addresses at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet. A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. The ISP logs the date, time, and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records. On the other hand, some ISP's,

NOV 1 8 2019

10

employ static IP addressing, that is a customer or subscriber's computer is assigned one IP address that is used to identify each and every Internet session initiated through that computer. Absent some break in service, static IP addresses generally do not change over a period of time, and typically remain assigned to a specific Internet service account.

vii. *Metadata*: "Metadata" can be described as data about data. A photograph or image file, for example, may include metadata that describes the size, color, and resolution of the photograph. Additionally, metadata may be information about the location a photograph was taken, the date the photograph was taken, and the make and model of the camera that was used to take the photograph.

viii. The terms "*records*" and "*information*" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writings, drawings or paintings); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

### Gmail

a.     In my training and experience, I have learned that Gmail is an e-mail

service hosted by Google LLC. I have learned that e-mail providers offer a variety of online services, including e-mail access, to the general public. Google Incorporated allows subscribers to obtain e-mail accounts at certain domain names, including gmail.com. Subscribers obtain an account by registering with the e-mail provider. During the registration process, the e-mail provider asks subscribers to provide basic personal information. Therefore, the computers and servers maintained by the e-mail provider are likely to contain stored electronic communications (including retrieved and un-retrieved e-mail for the e-mail provider's subscribers) and information concerning subscribers and their use of the e-mail provider's services, such as account access information, the e-mail transaction information, and account application information.

b. In general, an e-mail that is sent to the e-mail provider's subscriber is stored in the subscriber's "mail box" on the e-mail provider's servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on the e-mail provider's servers indefinitely.

c. When the subscriber sends an e-mail, it is initiated at the user's computer or other electronic device, transferred via the Internet to the e-mail provider's servers, and then transmitted to its end destination. The e-mail provider often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the e-mail provider's server, the e-mail can remain on the system indefinitely.

d. A sent or received e-mail typically includes the content of the message, source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail. If an e-mail user writes a draft message but does not send



12

it, that message may also be saved by the e-mail provider, but may not include all of these categories of data.

      e.    A subscriber of the e-mail provider can also store files, including e-mails, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned by the e-mail provider.

      f.    In my experience, subscribers do not routinely copy e-mails stored in their e-mail account in order to store the e-mails on a home computer or other location, although it is possible to do so. This is particularly true when they access their e-mail account through the Internet, or if they do not wish to maintain particular e-mails or files in their residence.

      g.    In general, e-mail providers like Google Incorporated ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

      h.    E-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the e-mail provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the



NOV 1 8 2019

13

IP address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

      i.     In some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

      j.     In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mails in the account, and attachments to e-mails, including pictures and files. Online bills and other receipts may be sent to an e-mail account, providing further user attribution evidence tied to the account and demonstrating who is ultimately committing the crimes under investigation.

## FACTS IN SUPPORT OF PROBABLE CAUSE

14. On 4/9/19, DEA in Anchorage was contacted by an employee of a mail shipping facility in Anchorage, AK. The employee wanted to report a suspicious package. The package was sent from "Dominic Kong" from a shipping store in Long Beach, California and was addressed to "Jasmine Kong" at 1579 Wintergreen, Street, Anchorage, AK 99508. The parcel was a large brown cardboard box approximately



NOV 1 8 2019

Case 3:19-mj-00556-MMS   Document 1-1   Filed 11/18/19   Page 14 of 22

18" X 18" X18" and weighed approximately 55 pounds. The shipper paid $533.05 in cash to ship the package.

15. On the same day, a scent detection K-9 exhibited a change in behavior consistent with the presence of an odor of a controlled substance the canine is trained to recognize. A subsequent search warrant of the parcel revealed approximately 21 pounds 6 ounces of a white crystalline substance which field tested presumptive positive for methamphetamine.

16. On 4/9/2019, at approximately 0800 hours, I conducted surveillance on the recipient address listed on the parcel: 1579 Wintergreen Street, Anchorage, AK 99508. I observed a silver Ford Flex bearing Alaska plate GDA189 parked in front of the residence in the street. The vehicle was registered to Pati LATWER JR.

17. The shipping company advised that this was be the fifth parcel of similar weight sent to this address from the same shipper since December 2018. All of the parcels were sent from the same area in California and shipped next day air. The shipping company also advised that there was one other parcel sent to 3135 E. 84th Avenue #2, Anchorage, AK 99507.

18. On 4/9/19, DEA Special Agent M. Lathrop drove by 3135 E. 84th Ave. #2. SA Lathrop observed a lifted black pickup truck bearing Alaska plate GYR398 which was also registered to Pati LATWER JR.

19. On 4/10/19 at approximately 0900 hours, a controlled delivery operation began on a parcel which previously contained approximately 21 pounds 6 ounces of methamphetamine. Agents determined Pati LATWER JR was the primary suspect and

suspected recipient of the parcel. At approximately 0917 hours, surveillance observed vehicle GDA184, a Silver Ford Flex belonging to LATWER JR, parked on the street outside of the target residence at 1579 Wintergreen St. At approximately 0953 hours, the package was delivered and left at the front door by DEA TFO. R. Pawlak. Shortly after the delivery, a male at the target residence was positively identified as LATWER JR by ATF Special Agent R. Borgeson. LATWER JR brought the package inside the residence. At approximately 1057 hours, surveillance observed LATWER JR leaving the house and then leaving in the Silver Ford Flex, GDA184.

20. At approximately 2050 hours the same day, agents made entry into 1579 Wintergreen Street, Anchorage, AK 99508 and retrieved the package, which was unopened, in the kitchen, pursuant to the Federal Beeper Order obtained on the parcel.

21. On or about February 15, 2019 and on or about March 13, 2019ATF Special Agent T. King, acting in an undercover capacity, purchased methamphetamine from "INDIVIDUAL 1" and "INDVIDUAL 2". On 6/19/19, a Federal Grand Jury in Anchorage, AK indicted INDIVIDUAL 1 and INDIVIDUAL 2 for one count of Conspiracy to Distribute Methamphetamine and three counts of Distribution of methamphetamine in relation to this case.

22. On 10/31/19, a proffer was conducted with INDIVIDUAL 1. INDIVIDUAL 1 is the romantic partner of INDIVIDUAL 2. During the proffer, INDIVIDUAL 1 said that LATWER JR., known to him/her as "RADON", was the main supplier of methamphetamine for INDIVIDUAL 1 and INDIVIDUAL 2. INDIVIDUAL 1 stated that immediately before SA King purchased methamphetamine from him/her and



NOV 1 8 2019

16

INDIVIDUAL 2 on February 15, the first time, LATWER JR. had brought over a large bag of methamphetamine to their apartment.

23. INDIVIDUAL 1 stated that his/her apartment was equipped with a video surveillance system and door lock through an app called Canary. This app allowed him/her to remotely view video on his/her iPhone, to save video recordings, and to remotely unlock the apartment door.

24. INDIVIDUAL 1 stated when the parcel intended for the Wintergreen St. address went missing, LATWER JR believed that INDIVIDUAL 2 was responsible. For stealing it. INDIVIDUAL 1 said that shortly after the parcel went missing, INDIVIDUAL 2 contacted him/her and asked him/her to unlock the door. INDIVIUDAL 1 looked at the video, which showed INDIVIDUAL 2 being forced into the apartment by LATWER JR and two other Samoan males. The video showed *at gunpoint* DRb 11/14/19    11/19/19 the men force INDIVIDUAL 2 to strip naked and beat him/her with a frying pan: the men then demanded INDIVIDUAL 2 tell them the location of the missing parcel.

25. INDIVIDUAL 1 returned to the apartment. When he/she arrived, LATWER JR. told him/her that if he/she didn't leave, they would have to "take [him/her] too". INDIVIDUAL 1 left and later returned to take INDIVIDUAL 2 to the hospital.

26. INDIVIUDAL 1 said he/she still had saved the recording of the assault on INDIVIDUAL 2 and emailed it to him/her, which he/she had saved in his/her Gmail accounts ksizzle1988@gmail.com and badbitty1988@gmail.com. INDIVIDUAL 1 said that he/she wanted to provide this information to Agents during the proffer. INDIVIDUAL 1 provided written and verbal consent to search his/her phone, Gmail

account and iCloud account at the time, but was unable to remember the password to unlock his/her iPhone.

27. INDIVIDUAL 1 has 6 prior criminal convictions, including a conviction for providing false information to a peace officer in 2008 and convictions for theft, operating under the influence, leaving the scene of an accident, and driving on a revoked license. He/she was convicted of felony possession of a schedule IA or IIA controlled substance in the State of Alaska, for which he/she received a suspended imposition of sentence: the set aside was granted in 2012. I believe that INDIVIDUAL 1 provided the information described above at least partially with the goal of reducing his/her criminal exposure in his/her pending federal case.

28. On November 15th, 2019, I served a request upon Google requesting that it preserve the contents of the SUBJECT GMAIL ACCOUNTS. Accordingly, I believe that the contents of those accounts are still available through and from Google.

29. I respectfully submit that there is probable cause to believe that the SUBJECT GMAIL ACCOUNTs contain evidence as it relates to the suspected methamphetamine trafficking activities of Pati LATWER Jr. and the commission of the following offenses, among others: 21 U.S.C. §§ 846 and 841(a)(1) (Conspiracy to Distribute Narcotics) and 18 U.S.C. §§ 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Offense) and 1201 (Kidnapping)

## EVIDENCE TO BE COLLECTED

30. I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and



NOV 1 8 2019

18

Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. It would be impractical and infeasible for the Government to review records produced by the Communication Accounts Provider and keep only such records as the Government finds to be related to the offenses described herein and in Attachment B during a single analysis.

31. From experience, I have learned that various e-mails often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is context-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between e-mail threads, and any respective attachments, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.

32. I have learned that multiple reviews of the activity in the account at different times is necessary to understand the full value of the information contained therein. In order to obtain the full picture and meaning of the data from the information sought in Attachment A and Attachment B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of



NOV 1 8 2019

19

probative value of the e-mails and data must be assessed within the full scope of the investigation. As such, I respectfully request the ability to maintain the whole of the data provided by the Communication Accounts Provider, and to review the communications in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will obtain the mirrored images in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

33. This application seeks a warrant to search all responsive records and information under the control of Google Incorporated, a provider subject to the jurisdiction of this court, regardless of where Google Incorporated has chosen to store such information. The Government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Google Incorporated's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

## REQUEST TO KEEP ACCOUNT ACTIVE

34. Because the investigation is ongoing, I further request the Court to order the Communication Accounts Provider to continue to maintain the account further detailed in Attachment A in an open and active status.



NOV 1 8 2019

20

## CONCLUSION

35. Based upon the information above, your affiant submits that there is probable cause to believe that violations of 21 U.S.C. §§ 846 and 841(a)(1) (Conspiracy to Distribute Narcotics) and 18 U.S.C. §§ 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Offense) and 1201 (Kidnapping) have been committed, that the items described in Attachment B are evidence, fruits, and instrumentalities of those violations and that the items described in Attachment B are likely to be found at the SUBJECT GMAIL ACCOUNTS described in Attachment A.

36. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

37. Because the warrant will be served of Google, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

38. I request that the Court issue a warrant authorizing searches of the SUBJECT GMAIL ACCOUNTS as described in Attachment A for the items described in Attachment B.



NOV 1 8 2019

21

_____

Dale R. Boothroyd
Task Force Officer
Drug Enforcement Administration


Subscribed and sworn to before me
this 18 day of November, 2019

_____

MATTHEW M. SCOBLE
United States Magistrate Judge
District of Alaska
Anchorage, Alaska

